UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **JAMES C. JUSTICE III;**<br>**A & G COAL CORP.;**<br>**CHESTNUT LAND HOLDINGS, LLC;**<br>**BLUESTONE COAL CORPORATION;**<br>**KENTUCKY FUEL CORPORATION;**<br>**NATIONAL COAL, LLC;**<br>**PREMIUM COAL COMPANY,**<br>**INCORPORATED;**<br>**S AND H MINING, INC.; and**<br>**TAMS MANAGEMENT, INC.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**OFFICE OF SURFACE MINING**<br>**RECLAMATION AND ENFORCEMENT,**<br>**UNITED STATES DEPARTMENT OF**<br>**THE INTERIOR,**<br><br>**Defendant.** | Civil Action No. 7:19-cv-00381<br><br><br><br><br>**AMENDED COMPLAINT** |

Plaintiffs, A & G Coal Corp., Bluestone Coal Corporation, Chestnut Land Holdings, LLC, Kentucky Fuel Corporation, National Coal, LLC, Premium Coal Company, Incorporated, S and H Mining, Inc., Tams Management, Inc. and James C. Justice III, by counsel, and for their Amended Complaint for Declaratory Judgment and Other Relief, respectfully state as follows:

I.  **THE PARTIES, JURISDICTION AND VENUE**

   A.  **The Parties**

   1.   Plaintiff James C. Justice III ("Jay Justice") is an individual residing in Roanoke, Roanoke County, Virginia. Jay Justice is the "Controller" of the "Justice Mining Entities" (as

1

that phrase is defined below) for purposes of enforcement of surface mining reclamation and enforcement laws and regulations by the Defendant.

2. Plaintiff A & G Coal Corp. ("A & G") is a Virginia corporation doing business or having done business in Wise and Dickenson Counties, Virginia that was the subject of various assessments by the Defendant.

3. Plaintiff Chestnut Land Holdings, LLC ("Chestnut") is a Delaware limited liability company doing business or having done business in Tazewell County in Virginia that was the subject of various assessments by the Defendant.

4. Plaintiff Bluestone Coal Corporation ("Bluestone") is a West Virginia corporation doing business or having done business in West Virginia that was the subject of various assessments by the Defendant.

5. Plaintiff Kentucky Fuel Corporation ("Kentucky Fuel") is a Delaware corporation doing business or having done business in Kentucky that was the subject of various assessments by the Defendant.

6. Plaintiff National Coal, LLC ("National Coal") is a Tennessee limited liability company doing business or having done business in Tennessee that was the subject of various assessments by the Defendant.

7. Plaintiff Premium Coal Company, Incorporated ("Premium") is a Tennessee corporation doing business or having done business in Tennessee that was the subject of various assessments by the Defendant.

8. Plaintiff S and H Mining, Inc. ("S & H") is a Tennessee corporation doing business or having done business in Tennessee that was the subject of various assessments by the Defendant.

9. Plaintiff Tams Management, Inc. ("Tams") is a West Virginia corporation doing business or having done business in West Virginia that was the subject of various assessments by the Defendant. (The Plaintiffs in this action other than James C. Justice III are sometimes referred to as the "Justice Mining Entities.")

10. Defendant, Office Of Surface Mining Reclamation And Enforcement ("OSMRE"), is an administrative agency within the United States Department Of The Interior tasked with enforcement of surface mining reclamation and enforcement laws and regulations.

**B.     Jurisdiction And Venue**

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1346 in that this is a civil action against the United States.

12. This Court has personal jurisdiction over OSMRE because the Defendant is an agency of the United States.

13. Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(e)(1) because the Defendant is an agency of the United States and a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this District—in particular the mining or related activities of several of the Justice Mining Entities which are located in this District including, but not limited to, A & G and Chestnut, and Jay Justice individually, in this District were subject to enforcement decisions that are part of the parties' overall settlement agreement this action seeks to enforce.

## II.     FACTUAL ALLEGATIONS

14. In the months and years leading up to April 2019, the OSMRE assessed various fines, special reclamation fees, penalties, and issued other notices and orders against the Justice Mining Entities.

15. For what is believed to be the first time ever, the OSMRE also wrongfully assessed a series of individual assessments against Jay Justice personally, allegedly relating to activities of the Justice Mining Entities.

16. By April 2019, OSMRE had asserted fines, penalties and assessments against each of the Justice Mining Entities and against Jay Justice personally. (See Exhibit A, partially redacted chart of underlying fines, penalties and assessments, attached and incorporated here by reference.)

17. In an effort to resolve the charges listed in Exhibit A in a manner that would ensure that the needed mine reclamation work was performed, while keeping the Justice Mining Entities solvent and actively in business, and while also generating and/or preserving hundreds of jobs associated with the reclamation work and the other ongoing business of the Justice Mining Entities, representatives of the parties agreed to hold a meeting in early April, 2019.

18. On April 8, 2019, Jay Justice and Tom Lusk, COO of the Justice Mining Entities, met with Michael Castle, the Field Office Director of the Knoxville and Lexington Field Offices of OSMRE, and Mark Snyder, also with OSMRE, in Knoxville. The discussions during that meeting were recounted in later correspondence from counsel for the Justice Mining Entities (attached as Exhibit B and incorporated by reference), as follows:

> Jay Justice and Tom Lusk met with Mike Castle and Mark Snyder without counsel. They discussed the penalties against the companies and the individual penalties against [Jay] Justice. They also discussed the abatement of cited conditions and reclamation work. Mr. Castle emphatically emphasized that he is focused on completing the field work. Mr. Castle then explained that, because there is no ongoing operation and the companies are not obtaining any financial benefit through non-compliance, he believes he has the authority to compromise the penalty assessments. [Jay] Justice then proposed that the companies work to complete the reclamation work in lieu of the penalty assessments and that the penalty assessments be reduced by the cost of the reclamation

> work.  If the total penalties are not reduced below $250,000.00 [two hundred fifty thousand dollars] by the cost of the reclamation work, [Jay] Justice proposed that the companies pay $250,000.00 [two hundred fifty thousand dollars] over twelve months to satisfy the remaining penalty assessments.  This meeting concluded with [Jay] Justice agreeing to pay the AML and special reclamation fees over twelve months.

(Exhibit B, p. 1.)

Mr. Castle and Jay Justice both agreed to the foregoing terms.

19. After lunch on the same day, the four initial conferees were joined by their respective attorneys.  The following discussions were held in the presence of attorneys:

> Mr. Castle indicated that the OSM wanted the penalties to be reduced by the cost of the reclamation on a dollar for dollar basis.  You [John Austin, Field Solicitor in the Knoxville Field Office of the Department of the Interior] mentioned during this meeting that you [Mr. Austin] would like to have some form of collateral, or some type of guarantee, that the companies would satisfy their obligations under any agreement.  We [the Justice Mining Entities] agreed to provide you with the financial documents upon your request.

(Exhibit B, p. 2.)

20. Jay Justice and Mr. Lusk met again with Mr. Castle and Mr. Snyder after the meeting with their respective attorneys, and discussed as follows:

> [Jay] Justice and Mr. Castle discussed whether collateral would ultimately be necessary. Mr. Castle indicated that he would discuss this issue with [Mr. Austin] and that he did not believe collateral would be required to resolve the matter.  During this meeting, it was agreed that Mr. Lusk would work with Mr. Snyder to prioritize the work in the field.  [Jay] Justice agreed that he would place equipment in the field by May 1, 2019 to complete the work and he met this deadline.  He also agreed to complete the work by October 31, 2019 weather permitting.

(Exhibit B, p. 2.)

Mr. Castle and Jay Justice again both agreed to the foregoing terms.

21. OSMRE consistently and clearly held out Mr. Castle as the agency's agent and representative for purposes of negotiating a settlement of the parties' disputes regarding payment of the assessments and fines levied against the Justice Mining Entities. Mr. Castle, in turn, consistently and clearly maintained that he, not the attorneys for OSMRE or the Department of the Interior, was empowered to negotiate agreements such as the one referenced above and in the attached correspondence.

22. Mr. Castle's predecessor, Earl Bandy (retired) was also always held out by OSMRE to be the authoritative and binding voice of OSMRE as it related to that agency's oversight of the Justice Mining Entities. Mr. Castle's position has always been held out as one having actual authority when it comes to the Justice Mining Entities' dealings with OSMRE.

23. Mr. Castle also expressed to Jay Justice that Mr. Castle's supervisor, Thomas Shope, Regional Manager of the Appalachian Region of OSMRE, approved the parties' agreement. The Appalachian Region of OSMRE encompasses all the states where the Plaintiffs had operations that are the subject of the parties' agreement.

24. Mr. Austin merely suggested alternative or supplemental terms to the parties. Mr. Austin's suggestions or requests were not held out by OSMRE or Mr. Castle to be essential to the parties' final agreement. Mr. Castle instead told Jay Justice not to worry about Mr. Austin's requests for information or collateral.

25. Jay Justice and the Justice Mining Entities left the three meetings held on April 8, 2019 believing an agreement had been reached as to all material terms. Mr. Lusk thereafter spent time in the field on April 15 – 18, 2019 with Mr. Snyder and agreed on the reclamation work that would be completed and a timeframe.

26. Counsel for the Justice Mining Entities wrote Mr. Austin on April 26, 2019 and invited him to request any additional financial information necessary to effectuate the parties' agreement. Following that correspondence, Mr. Austin went two weeks without requesting any financial information or requesting collateral in any form or amount.

27. In the meantime, and in reliance upon the terms of the parties' agreement reached April 8, 2019 (the "Settlement Agreement"), the Justice Mining Entities had already begun to incur significant expense in mobilizing equipment and commencing the reclamation work OSMRE had requested. Before the end of April 2019, the Plaintiff's had already commenced their performance under the Settlement Agreement, and have continued performing in accordance with that Agreement to this day.

28. Between April 8, 2019 and early May, 2019, Mr. Castle and Mr. Shope, among others with OSMRE, were copied on emails and correspondence between counsel for the parties discussing the implantation of the parties' Settlement Agreement, and at no time did any officers or representatives of OSMRE express any reservations about the finality and enforceability of the Settlement Agreement.

29. In the week of May 6, 2019, the government's attitude toward the Justice Mining Entities noticeably soured. The Mine Health and Safety Administration ("MSHA"), even though it was party to a tolling agreement with the Justice Mining Entities, brought suit against some of those entities in apparent violation of the tolling agreement, early in the week of May 6, 2019.

30. This event led to Mr. Austin contacting counsel for the Justice Mining Entities to relay his assumption that the filing of the MSHA suit meant that the Justice Mining Entities would be unable to perform their duties under the Settlement Agreement. When told that his assumption was totally unfounded and that the Justice Mining Entities still intended to abide by

the Settlement Agreement, Mr. Austin suddenly renewed his requests for collateral and financial information.

31. On or about May 12, 2019, less than one business day after the foregoing request, the Justice Mining Entities agreed to provide the requested collateral and financial information, even though they did not believe it was a prerequisite to OSMRE's performance under the terms of the Settlement Agreement.

32. On May 15, 2019, Mr. Austin wrote counsel for the Justice Mining Entities and denied the existence of any agreement to abate or otherwise reduce the fines and assessments reference in Exhibit A—a complete and unforeseeable reversal of the OSMRE's position. Instead, Mr. Austin claimed, <u>for the very first time in the parties' discussions</u>, that Mr. Castle had never had authority to bind OMSRE to the terms of the Settlement Agreement. (<u>See</u> <u>Exhibit</u> <u>C</u>, attached and incorporated here by reference.) Instead of abiding by the Settlement Agreement, Mr. Austin announced he was proceeding to instruct the Department of Justice to sue to collect the fines and assessments referenced in Exhibit A.

33. By virtue of the May 13, 2019 letter from Mr. Austin, OSMRE has entirely reneged on the Settlement Agreement. This, despite the fact that OSMRE held out Mr. Castle as having apparent and actual authority, despite the fact that the Justice Mining Entities relied to their detriment on the position adopted by Mr. Castle that there was a binding Settlement Agreement, and despite the Justice Mining Entities' partial and continuing performance of their duties and responsibilities pursuant to the Settlement Agreement, which without a doubt had to be politically driven.

34. As the Plaintiffs previously made OMSRE and its attorneys aware, preceding litigiously instead of in accordance with the Settlement Agreement harms the operations of a

dozen or so mining companies, and risks the jobs of hundreds of workers on the pending reclamation projects.

35. The abrupt turnaround by the government in its attitude toward this matter is inexplicable and raises the question whether untoward political or other pressure from sources presently unknown has been brought to bear on OMSRE, perhaps from other federal agencies or political adversaries of the Justice family. The repudiation of the Settlement Agreement may have resulted from inappropriate inter-agency influence between MSHA and OSMRE. Discovery will be necessary to establish why OMSRE so rapidly changed its position.

36. In any event, OMSRE's conduct in reneging on the Settlement Agreement creates a legitimate dispute and justiciable controversy that requires the intervention of the Court to resolve.

## COUNT I
### (Declaratory Judgment)

37. Plaintiffs repeat and reallege each and every allegation set forth in the preceding Paragraphs of this Complaint as if fully set forth herein.

38. A real and justiciable controversy exists between the Plaintiffs and the Defendant regarding whether those parties entered into an enforceable Settlement Agreement.

39. Because OSMRE has stated that it intends to disregard the parties' Settlement Agreement and initiate litigation against the Plaintiffs on the underlying assessments, fees and penalties that are the subject of the Settlement Agreement, there also exists an immediacy to the need for an adjudication and declaratory judgment regarding the enforceability of the Settlement Agreement.

40. If OSMRE is permitted to litigate and otherwise pursue the underlying assessments, fees and penalties without there first being an adjudication and declaratory

judgment regarding the enforceability of the Settlement Agreement, the Plaintiffs will suffer economic and other real damages. Any suit filed by the government in contravention of the Settlement Agreement would create a false impression and arguably be defamatory in that it would cause harm to the business and personal reputations of the Plaintiffs.

41. The Plaintiffs are therefore entitled to a declaratory judgment pursuant to 28 U.S.C. 2201 that the Settlement Agreement is valid and enforceable against OSMRE and that OSMRE should take no further steps regarding the underlying assessments, fees and penalties.

WHEREFORE, the Plaintiffs respectfully request Judgment on their Complaint herein as follows:

A. A Judgment on Count I for a declaratory judgment;

B. Trial by jury on all counts so triable; and

C. Such further relief as Plaintiffs appear entitled, in addition to the costs and disbursements of this action.

Respectfully submitted,

/s/ Aaron B. Houchens
AARON B. HOUCHENS (VSB #80489)

AARON B. HOUCHENS, P.C.
111 East Main Street
P.O. Box 1250
Salem, Virginia 24153
Telephone: (540) 389-4498
Facsimile: (540) 339-3903
aaron@houchenslaw.com

And

RICHARD A. GETTY
(*Pro Hac Vice* Admission pending)
C. THOMAS EZZELL
(*Pro Hac Vice* Admission pending)
 and
MARCEL RADOMILE
(*Pro Hac Vice* Admission pending)

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507
Telephone: (859) 259-1900
Facsimile: (859) 259-1909
Email: rgetty@gettylawgroup.com
Email: tezzell@gettylawgroup.com
Email: mradomile@gettylawgroup.com

COUNSEL FOR PLAINTIFFS

mwepld0753

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd of August 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and the foregoing was sent via U.S. mail to the following:

Thomas T. Cullen, Esq.
United States Attorney
United States Attorney's Office for the Western District of Virginia
BB&T Building
310 First Street, S.W. Room 906
Roanoke, VA 24008
540-857-2250
Fax: 857-2179

/s/     Aaron Balla Houchens___